**AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**Jack S. KING and Ellen King, Defendants–Appellees.**

No. 02CA0927.

Colorado Court of Appeals, Div. IV.

Oct. 23, 2003.

Certiorari Denied Sept. 7, 2004.

Dworkin, Chambers & Williams, P.C., Steven G. York, Geri O'Brien Williams, Denver, Colorado, for Plaintiff–Appellant.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Colorado; Earl S. Wylder, Greenwood Village, Colorado; Phil C. Pearson, M.D., J.D., Greenwood Village, Colorado; Rick A. Carmickle, Greenwood Village, Colorado, for Defendants–Appellees.

Opinion by Judge WEBB.

Plaintiff, American Guarantee and Liability Insurance Company (American), appeals from the judgment entered following a bench trial, dismissing its subrogation claim with prejudice and ruling in favor of defendants, Jack S. King and his wife, Ellen King, on their respective counterclaims for insurance bad faith and abuse of process. We affirm.

This case arose from settlements in two underlying proceedings: a workers' compensation claim under which King received benefits from American, his employer's insurer; and the Kings' later medical malpractice action concerning other treatment by the same doctor who treated King for the industrial injuries.

Following King's settlement of the workers' compensation claim with American, the doctor continued to treat him. Two years later King was diagnosed with progressive kidney disease. King then brought the malpractice action alleging that the doctor failed to diagnose and treat the kidney disease during initial treatment for the industrial injuries. His wife made a loss of consortium claim. King's attorney notified American that it may wish to assert subrogation rights under § 8–41–203, C.R.S.2002.

A mediator in the malpractice case told American's attorney that he did not believe

American had a subrogation right in the case because it involved medical malpractice. The attorney advised American that it likely had a lien on any malpractice settlement proceeds, "to the extent that an expert could testify on causation, i.e. that [American] paid medical bills and wage loss" which resulted from the kidney disease. American ceased using this attorney.

Shortly after the mediation, King and his wife settled the malpractice case for a joint payment of $250,000, which was not apportioned either between them or by damage category. American then brought this action against King, his wife, and their attorney, on the basis that the malpractice settlement included wage loss and medical expenses which American had paid to King. The claim against the attorney was dismissed. American later joined the doctor as a defendant. The claim against him was also dismissed.

American's new attorney informed it that medical records and depositions of doctors taken in the malpractice case did not indicate kidney disease caused King's fatigue, which resulted in the wage loss, and that American needed to obtain a medical opinion on causation. One potential expert witness told American that kidney disease likely did not cause King's fatigue. American never obtained a medical opinion establishing causation.

At trial, American dismissed its only remaining claim against King's wife, for intentional interference with contract. At the close of American's evidence, the court granted King's motion for involuntary dismissal of the subrogation claim under C.R.C.P. 41(b)(1).

After hearing evidence on the counterclaims, the court made extensive oral and written findings and concluded that: the evidence established King's bad faith counterclaim beyond a reasonable doubt; a preponderance of the evidence established his wife's abuse of process counterclaim; clear and convincing evidence justified doubling the cap on King's noneconomic damages under § 13–21–102.5, C.R.S.2002; and the evidence established beyond a reasonable doubt that American's actions as to King were attended by circumstances of malice or willful and

wanton conduct under § 13–21–102, C.R.S. 2002.

The court awarded King noneconomic damages of $500,000 and punitive damages of $1,500,000, awarded his wife noneconomic damages of $250,000, and awarded both of them their attorney fees.

## I.  Subrogation Claim

American first contends the trial court erred in dismissing its subrogation claim under C.R.C.P. 41(b)(1). We disagree.

"The trial court is afforded wide discretion in determining whether a motion for dismissal under C.R.C.P. 41(b) should be granted. Its ruling in this regard will not be disturbed on appeal in the absence of a showing that the findings and conclusions of the trial court are so manifestly against the weight of evidence as to compel a contrary result." *Smith v. Weindrop*, 833 P.2d 856, 857 (Colo.App.1992).

Under C.R.C.P. 41(b)(1), the standard is whether judgment in favor of the defendant is justified on the evidence presented, not whether the plaintiff established a prima facie case. *Teodonno v. Bachman*, 158 Colo. 1, 404 P.2d 284 (1965). Thus, the trial court sitting as trier of fact may determine the facts and render judgment against the plaintiff. *Rowe v. Bowers*, 160 Colo. 379, 417 P.2d 503 (1966).

### A.

American argues the trial court erred in dismissing its claim on the basis of evidence that kidney disease did not cause King's wage loss paid by American. We disagree.

Colorado workers' compensation law limits an insurer's subrogation rights to economic damages; subrogation does not extend to noneconomic damages or recovery for loss of consortium. *Colo. Comp. Ins. Auth. v. Jorgensen*, 992 P.2d 1156 (Colo.2000)(*Jorgensen* ).

American's settlement with King expressly reserved its rights against third parties under § 8–41–203 "for damages arising out of the incidents which are the subject of this

claim for workers' compensation." American has not appealed the trial court's summary judgment ruling that this phrase applied only to injuries arising from the industrial accident. Thus, American's subrogation rights are limited to payment by the doctor to King for economic losses arising from the industrial accident for which American had already paid.

This limitation is unaffected by American's argument based on the quasi-course of employment doctrine. According to American, because this doctrine makes injuries suffered traveling to or from treatment for an initial industrial injury compensable under workers' compensation, aggravation of such an injury would likewise be compensable. Even if American is correct, American presented no evidence that malpractice aggravated King's injuries from the industrial accident.

Despite the undisputed evidence that kidney disease did not cause the wage loss, American contends it satisfied the totality of circumstances test under *Jorgensen* for enforcing a subrogation claim against proceeds of a third-party settlement. American relies on evidence, also undisputed, of King's position in the malpractice action that his damages included wage loss during the time covered by payments from American. We are not persuaded.

In *Jorgensen*, the court recognized that, based on the totality of circumstances, a trial court deciding an insurer's subrogation claim against proceeds of a third-party settlement "may determine whether the settlement was fair and reasonable with regard to the amounts designated as loss of consortium and noneconomic [loss]." 992 P.2d at 1166; *see also Rains v. Kolberg Mfg. Corp.*, 897 P.2d 845 (Colo.App.1994)(in deciding insurer's subrogation claim, court should determine reasonableness of third-party settlement involving dismissal of injured worker's claim and allocating entire payment to wife's loss of consortium claim).

■ In determining a subrogation claim by allocating third-party settlement proceeds among damage categories, the court should look at the record in the underlying action. *Jorgensen.* The court may also consider the nature and extent of the claim on which payment is made, the potential value of any dismissed claim, and "the expectations and motivations of the settling parties." *Rains v. Kolberg Mfg. Corp., supra,* 897 P.2d at 848; *see also Shon v. Subaru of Am., Inc.,* 753 P.2d 793 (Colo.App.1988)(evidence must be submitted as to the value of the third-party claim).

■ Here, American presented no evidence of the doctor's subjective intent that the settlement included any compensation for the wage loss paid by American. The trial court's mistaken comment that the doctor's lawyer had not seen the report of King's economist fails to show that the doctor intended to pay King for this wage loss, especially in light of the lawyer's affidavit that he did not believe King could prove failure to diagnose the kidney disease caused wage loss. Nor did American present any evidence as to the objective value of King's malpractice claim.

In the absence of such evidence, expert medical testimony that the doctor's failure to diagnose and treat the kidney disease caused this wage loss would have been another basis for determining whether a fair and reasonable, but unapportioned settlement included some or all of the wage loss paid by American. *Cf. Indus. Comm'n v. Standard Ins. Co.,* 149 Colo. 587, 370 P.2d 156 (1962)(in determining an insurer's subrogation rights to the settlement proceeds of an action against a third-party doctor for malpractice that aggravated an industrial injury, evidence of medical causation is necessary). However, on cross-examination American's only medical expert testified to a reasonable degree of medical probability that kidney disease did not cause King's fatigue which resulted in the wage loss.

Evidence of King's position from the record in the malpractice case that his damages included this wage loss may indicate his settlement expectations. However, this evidence involved only his contentions; medical causation was not within his knowledge or that of his economist. Hence, we cannot conclude that this evidence outweighed the admission of American's· medical expert on lack of causation.

American's assertion that it was entitled to a *Jorgensen* hearing does not change our conclusion. In some cases, judicial economy may favor determining the subrogation right before considering apportionment. Here, however, given American's undisputed payment of wage loss and the unapportioned settlement payment to the Kings, we discern no material difference between weighing American's evidence for apportionment at a *Jorgensen* hearing and weighing its evidence in support of the subrogation claim. Hence, we conclude that the undisputed evidence of lack of causation would be equally fatal to American in either setting.

We also reject American's argument that when, as here, the injured worker enters into a confidential, unapportioned third-party settlement, the court's relying on evidence of medical causation encourages double recovery and circumvents subrogation, contrary to Colorado policy.

■ The settlement with the doctor is not inherently suspect because of confidentiality. *Cf. Pierce v. St. Vrain Sch. Dist. RE–1J*, 981 P.2d 600 (Colo.1999). Regardless of how a third-party settlement apportions payment, to protect an insurer's subrogation rights a court may reallocate payment based on reasonableness of the settlement. *Jorgensen, supra.* Moreover, even if an unapportioned settlement creates a greater danger of double recovery, here American's own medical expert conceded that kidney disease did not cause the wage loss which American seeks to recover.

Accordingly, we conclude the trial court properly dismissed American's subrogation claim based on evidence that kidney disease did not cause the wage loss.

### B.

American argues that King is judicially estopped by his position in the malpractice action that his damages included the wage loss. Again, we disagree.

■ Judicial estoppel "is an equitable doctrine by which courts require parties to maintain a consistency of positions in the proceedings, assuring promotion of truth and preventing the parties from deliberately shifting positions to suit the exigencies of the moment." *Estate of Burford v. Burford*, 935 P.2d 943, 947 (Colo.1997).

■ For the doctrine to apply, at a minimum five circumstances must be present:

[F]irst, the two positions must be taken by the same party or parties in privity with each other; second, the positions must be taken in the same or related proceedings involving the same parties or parties in privity with each other; third, the party taking the positions must have been successful in maintaining the first position and must have received some benefit in the first proceeding; fourth, the inconsistency must be part of an intentional effort to mislead the court; and fifth, the two positions must be totally inconsistent—that is, the truth of one position must necessarily preclude the truth of the other.

*Estate of Burford, supra*, 935 P.2d at 948.

King's complaint, his discovery responses, and his economist's report in the malpractice action similarly state that his damages included wage loss during a time which overlapped the wage loss paid by American. King is a party to both actions, which are related.

■ However, American has not shown that the doctor included this wage loss in the settlement, and thus, King was not shown to have benefited from this position in the malpractice action. Moreover, the record shows no intentional effort by King to mislead the court in this case. Because neither King nor his economist had personal knowledge of medical causation, the positions are not totally inconsistent.

Accordingly, King is not estopped from raising lack of medical causation evidence.

### C.

American argues it submitted sufficient evidence of double recovery and circumvention of subrogation rights to defeat the C.R.C.P. 41(b) motion. We disagree.

■ The trial court found, with record support, that: the medical malpractice claim was not based on a misdiagnosis, mistreat-

ment, or maltreatment of the industrial injury; the malpractice claim was an independent cause of action—the nonidentification of a kidney ailment; the doctors who testified in the medical malpractice case and the doctors consulted by American indicated no correlation between the two actions; and the kidney condition would have been asymptomatic for the wage loss period in question and would not have required King to discontinue his employment.

Accordingly, involuntary dismissal of American's subrogation claim under C.R.C.P. 41(b) was within the trial court's discretion.

## II. Bad Faith

American next argues the trial court applied an incorrect legal standard in concluding that American violated its duty to deal with King in good faith by maintaining the subrogation claim against him. We disagree.

The existence and nature of a duty are questions of law. *Univ. of Denver v. Whitlock,* 744 P.2d 54 (Colo.1987). We review questions of law de novo. *Bazemore v. Colo. State Lottery Div.,* 64 P.3d 876 (Colo. App.2002).

In a first-party bad faith case, we measure the conduct of an insurer using two elements: "unreasonable conduct, and knowledge that the conduct is unreasonable or a reckless disregard for the fact that the conduct is unreasonable." *Travelers Ins. Co. v. Savio,* 706 P.2d 1258, 1272 (Colo.1985)(*Savio* ). This standard governs the relationship between a workers' compensation insurer and an insured employee. *Savio.*

In a first-party bad faith case based on commencement of an administrative workers' compensation appeal by an insurer, such action is unreasonable only if it lacks "substantial justification," that is, the insurer has no "rational argument based on law or evidence." *Tozer v. Scott Wetzel Servs., Inc.,* 883 P.2d 496, 499 (Colo.App.1994)(citing *W. United Realty, Inc. v. Isaacs,* 679 P.2d 1063 (Colo.1984)).

American argues *Tozer's* interpretation of "unreasonable" governs the bad faith claim here and thus required King to show that no rational basis supported maintenance of American's suit against him. We are not persuaded.

In *Tozer,* a division of this court adopted a standard of unreasonableness based on Colo. Sess. Laws 1991, ch. 219, § 8–43–216(1) at 1321. That section provided for an attorney fees award against any party to a workers' compensation proceeding who asserted a claim or defense lacking "substantial justification," defined as a claim or defense that was "substantially frivolous, substantially groundless, or substantially vexatious." *See Tozer, supra,* 883 P.2d at 499.

The *Tozer* division also looked to the similar test of "substantial justification" established for a fee award under § 13–17–102(4), C.R.S.2002, that the proponent could present no rational argument based on the evidence or the law to support a claim or defense.

We conclude *Tozer's* narrow definition of "unreasonable" does not govern the bad faith claim before us.

*Tozer* involved an appeal expressly provided for in the Workers' Compensation Act, not a civil action. The division addressed only the decision to commence the appeal, not the question of bad faith in maintaining the proceeding, which is presented here. And the former § 8–43–216(1), on which the division primarily relied, has been repealed.

Moreover, in *Brandon v. Sterling Colorado Beef Co.,* 827 P.2d 559 (Colo.App.1991), another division resolved a bad faith claim similar to that presented in *Tozer* based on the two-element test of *Savio.*

Nevertheless, American emphasizes broad language in *Tozer* concerning application of the lack of substantial justification standard of § 13–17–101, et seq., C.R.S.2002, to the commencement or maintenance of "all" legal proceedings that form the basis for first-party bad faith claims. This language is dictum, and we decline to adopt it.

Section 13–17–101, et seq., adopts a narrow standard for the limited purpose of awarding attorney fees to deter frivolous litigation. The statute does not depend on any special relationship between the parties.

In contrast, tort liability for insurance bad faith derives from the "special nature of the insurance contract and the relationship which exists between the insurer and the insured." *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo.1984); *see also Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462 (Colo.2003)(an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action sounding in tort).

Section 13–17–101, et seq., balances the traditional American Rule that attorney fees are not recoverable by the prevailing party against the need to promote effective judicial administration by deterring the filing of groundless, frivolous, or vexatious actions. *See* § 13–17–101; *Double Oak Constr., L.L.C. v. Cornerstone Dev. Int'l*, 97 P.3d 140, 2003 WL 22208362 (Colo.App. No. 02CA1162, Sept. 25, 2003).

The tort of insurance bad faith deters an insurer's abuse of its unequal bargaining power against its insured. *See Cary, supra* (a workers' compensation provider, like an insurer in contractual privity with an insured, has a financial incentive to use its leverage to limit claims); *cf. Transamerica Premier Ins. Co. v. Brighton Sch. Dist. 27J*, 940 P.2d 348 (Colo.1997)(absent the prospect of damages for bad faith breach, an insurer has every interest in retaining money, earning higher rates of interest on the outside market, and hoping to force the insured into a settlement for less than the policy amount).

Thus, we conclude the lack of substantial justification standard of § 13–17–101, et seq., unduly limits the calculus of "unreasonable" in the insurance bad faith context. *Cf. Brandon v. Sterling Colo. Beef Co., supra*.

The trial court found, with record support, that American maintained its suit out of dislike for King, without proper investigation, and in disregard of information that it did not have a claim; that it attempted to hide this information; that it was aware of and sought to exploit King's vulnerable health; and that it joined the doctor as a defendant to trigger King's indemnification under the settlement agreement, thereby putting more pressure on him.

These findings support the trial court's ultimate conclusion of bad faith under the unreasonableness standard of *Savio*. The trial court's incorrect use of the third-party "equal consideration" standard does not detract from the overall sufficiency of these findings to support its conclusion.

Accordingly, we discern no error in the trial court's resolution of the bad faith claim against American.

## III. CRE 408

American next contends the trial court violated CRE 408 by admitting the statement of the mediator that American's subrogation interest did not extend to a medical malpractice action. We disagree.

Trial courts enjoy broad discretion in ruling on the admissibility of evidence. *Tran v. Hilburn*, 948 P.2d 52 (Colo.App. 1997). We reverse only upon an abuse of discretion. *Tran, supra*.

As a preliminary matter, we agree American preserved its objection that the mediator's statements were inadmissible by filing an in limine motion. *See Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322 (Colo.1986)(objection to evidence adequately preserved if objection was made in pretrial motion in limine). We also agree that mediation communications enjoy greater protection than settlement communications under CRE 408. *See Nat'l Union Fire Ins. Co. v. Price*, 78 P.3d 1138, 2003 WL 21026780 (Colo.App. No. 02CA0736, May 8, 2003). However, American concedes it preserved only the CRE 408 objection.

Although CRE 408 bars the admission of evidence of conduct and statements made during the course of compromise negotiations to prove the validity or amount of a claim, such evidence may be admitted for other purposes. *See Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454 (Colo.App.2003). For example, settlement communications may be admitted to prove a defendant's knowledge. *Southwest Nurseries, LLC v. Florists Mut. Ins., Inc.*, 266 F.Supp.2d 1253 (D.Colo.2003)(decided under similar Fed.R.Evid. 408).

■ Here, the trial court admitted this evidence for the limited purpose of demonstrating that prior to commencing this action, American knew of the mediator's opinion that it had no right of subrogation. We discern no abuse of discretion.

Nevertheless, American argues the trial court further erred in considering the mediator's opinion to determine liability because it referred to American having "totally disregarded" that opinion. We are not persuaded.

The trial court did not treat the mediator's opinion as proof of bad faith because the opinion correctly stated the law. That opinion predated American's filing of the action, which the trial court expressly found was not in itself bad faith. Rather, the mediator's opinion—whether correct or incorrect—represented only one of several factors that the court found American ignored, in violation of its duty to investigate in good faith. Hence, we conclude that the trial court considered the mediator's opinion only for the limited purpose for which it was admitted. *Cf. Howard v. Int'l Trust Co.*, 139 Colo. 314, 338 P.2d 689 (1959).

■ Moreover, even if this evidence were considered for the improper purpose of liability on the bad faith counterclaim, any error is harmless. Sufficient other competent evidence was before the court to sustain the judgment. *See Hunter v. Wilson*, 147 Colo. 36, 362 P.2d 553 (1961).

Accordingly, we· discern no reversible error.

## IV. Abuse of Process

American next contends the trial court erred in finding that its claims against King's wife constituted an abuse of process. We disagree.

■ As relevant here, a claim for abuse of process requires proof of, among other things, an ulterior purpose for the use of a judicial proceeding and willful action in the use of that process which is not proper in the regular course of the proceedings. *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367 (Colo.App.1994).

American challenges the findings as to these elements on the basis that its claims against King's wife properly invoked the trial court's jurisdiction over a party affected by a settlement which was subject to apportionment under *Jorgensen* and *Rains*. We are not persuaded.

■ The division in *James H. Moore & Associates Realty, Inc., supra,* distinguished these elements, explaining, "Use of a legal proceeding in an improper *manner* is an essential element of an abuse of process claim. Thus, although the litigant's motive may be important in determining whether there was an 'ulterior purpose' for the use of the process, it still must be established that, viewed objectively, there was an improper *use* of the process." 892 P.2d at 373 (citation omitted; emphasis in original).

Among examples of the requisite improper use, the division noted accomplishing a coercive goal that is not the intended legal purpose of the process, citing *Aztec Sound Corp. v. Western States Leasing Co.*, 32 Colo.App. 248, 510 P.2d 897 (1973)(defendant used replevin action not properly to regain property, but improperly as a means of forcing plaintiff to pay sum of money not due). *See also* W. Prosser, *Handbook of the Law of Torts* § 121 (4th ed. 1971)("Some definite act or threat not recognized by the process, or aimed at an objective not legitimate in the use of the process, is required.").

■ Here, as to the first element the trial court found American had an ulterior purpose of obtaining leverage over King on the subrogation claim by making claims against his wife and that, at the time American filed the case against King's wife, it had no information of her involvement with the malpractice settlement beyond her claim for loss of consortium. These findings enjoy record support.

American's challenge to this finding assumes that a theoretically proper motive defeats the trial court finding of an ulterior purpose, as a matter of law. American cites no authority for this contention, and we have found none. *Cf.* Restatement (Second) of Torts § 682 & comment b (1977)("One who uses a legal process ... *primarily* to accom-

plish a purpose for which it is not designed is liable for abuse of process" (emphasis supplied)). Moreover, the court's finding of an ulterior purpose impliedly rejects American's assertion that it acted for a proper motive. *Cf. People v. Pease,* 934 P.2d 1374 (Colo. 1997).

As to the second element, the trial court further found, also with record support, that the principal reason for filing the lawsuit against King's wife "was other than to assert a valid claim, [but was] to obtain money without a valid claim." Using process against King's wife to obtain money from him is not a legitimate objective for that process. *See Lauren Corp. v. Century Geophysical Corp.,* 953 P.2d 200 (Colo.App.1998)(abuse of process established where plaintiff filed action to coerce defendant into transferring software to a third party); Restatement (Second) of Torts, *supra,* § 682 comment a ("The gravamen ... is the misuse of process ... for any purpose other than that which it was designed to accomplish.").

Accordingly, we conclude the trial court did not err in deciding the abuse of process claim in favor of King's wife.

The judgment is affirmed.

Chief Judge DAVIDSON and Judge KAPELKE concur.